**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CRAIG FRANKLIN,

Plaintiff,

         - against -

STEPHEN WATERS, COMPASS
ADVISERS GROUP LLC, COMPASS
PARTNERS ADVISORS, LLP,
COMPASS PARTNERS
INTERNATIONAL, LLP and COMPASS
PARTNERS INTERNATIONAL II, LLP,

Defendants.

Case No.   16 Civ. 9819 (AKH)

**DEFENDANTS COMPASS PARTNERS INTERNATIONAL, LLP**
**AND COMPASS PARTNERS INTERNATIONAL, II LLP'S MEMORANDUM OF**
**LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

Alfred U. Pavlis (AP 4895)
Tony Miodonka (TM 5464)
FINN DIXON & HERLING LLP
Six Landmark Square
Stamford, Connecticut 06901
Telephone: (203) 325-5000
Facsimile: (203) 325-5001

*Attorneys for Defendants*
*Compass Partners International, LLP and*
*Compass  Partners International II, LLP*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

I.     History of the Compass "Brand" ................................................................. 3

II.    The UK Defendants .................................................................................... 4

III.   Relationship Among the UK Defendants, the Delaware Defendants and Plaintiff ........... 5

       A.     Waters' Interest in the UK Defendants .......................................... 5

       B.     Project Penguin ............................................................................. 6

IV.    The UK Defendants' Limited Contacts With New York and Plaintiff ........................... 7

PROCEDURAL HISTORY ................................................................................................. 8

ARGUMENT ................................................................................................................. 10

I.     The Court Lacks Personal Jurisdiction Over the UK Defendants ............................. 10

       A.     Standard for Exercising Personal Jurisdiction Over the Jersey Defendants
              Under New York's Long-Arm Statute ................................................ 11

              1.     New York's Long-Arm Statute, CPLR § 302(a) ............................ 11

              2.     Transacting Business in New York Under CPLR § 302(a)(1) ............. 13

              3.     Claim Must "Arise From" Defendant's Transaction of Business in
                     New York ................................................................................ 15

       B.     The UK Defendants Do Not Transact Business In New York ............................ 16

       C.     The UK Defendants' Alleged Contacts With New York are Unrelated to
              Plaintiff's Claims ........................................................................... 21

       D.     Exercising Personal Jurisdiction Over the UK Defendants Would Violate
              Due Process Under the U.S. Constitution ............................................ 24

              1.     Constitutional Standard .............................................................. 24

              2.     The UK Defendants Have Only Limited Contacts With New York ........ 25

II.    The Complaint Fails To State a Claim Against the UK Defendants ............................ 26

       A.     Rule 12(b)(6) Standard ................................................................... 26

       B.     The SAC Fails to State a Claim for Breach of Contract Against the UK
              Defendants ................................................................................... 28

              1.     The UK Defendants Are Not Parties to the Allegedly Breached
                     Contracts and are Therefore Not Bound by Them ............................ 28

              2.     There is No Basis for Conflating All of the Defendants ...................... 33

C.      The SAC Fails to State a Claim Against the UK Defendants for Violations
        of New York Labor Law...................................................................................... 34

        1.      There is No Allegation From Which the Court Can Conclude That
                The UK Defendants Employed Plaintiff.................................................... 35

        2.      Plaintiff's Allegations Do Not Establish a Joint Employment
                Relationship ........................................................................................... 36

D.      The SAC Fails to State a Claim for Unjust Enrichment ....................................... 38

        1.      There is no Bona Fide Dispute About the  Existence of a Valid and
                Enforceable Contract ............................................................................... 38

        2.      Plaintiff Fails to Sufficiently Allege Unjust Enrichment......................... 40

CONCLUSION.................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
  98 F.3d 25 (2d Cir. 1996)...........................................................................15, 18, 22

*In re Alcatel Securities Lit.*,
  382 F. Supp. 2d 513 (S.D.N.Y. Feb. 28, 2005)........................................................29

*Alpha Capital Anstalt v. Oxysure Systs., Inc.*,
  252 F. Supp. 3d 332 (S.D.N.Y. 2017)......................................................................3

*Aquiline Capital Partners LLC v. FinArch LLC*,
  861 F. Supp. 2d 378 (S.D.N.Y. 2012).................................................................13, 14

*Arch Specialty Insurance Co. v. Entertainment Specialty Ins. Services, Inc.*,
  2005 WL 696897 (S.D.N.Y. Mar. 24, 2005) .............................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................27

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  171 F.3d 779 (2d Cir. 1999)..................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................27

*Bellino Schwartz Padob Advert., Inc. v. Solaris Mktg. Grp., Inc.*,
  222 A.D.2d 313 (1st Dep't. 1995) ...........................................................................39

*Benson & Assocs., Inc. v. Orthopedic Network of New Jersey*,
  1998 WL 388531 (S.D.N.Y. July 13, 1998) ..............................................................14

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007)...................................................................................10

*Brown v. New York City Hous. Auth.*,
  2006 WL 1378599 (S.D.N.Y. May 17, 2006) ..........................................................27

*Byun v. Amuro*,
  2011 WL 10895122 (S.D.N.Y. Sept. 6, 2011)......................................................11, 35

*Carter v. Dutchess Community College*,
  735 F.2d 8 (2d Cir. 1984)..................................................................................37, 38

*Cassano v. Altshuler*,
   186 F.Supp.3d 318 (S.D.N.Y. 2016)........................................................................24

*Clark-Fitzpatrick, Inc. v Long Is. R. Co.*,
   70 NY. 2d 382, 388 (N.Y. 1987) ...........................................................................38

*Crabtree v. Tristar Automotive Grp., Inc.*,
   776 F. Supp. 155 (S.D.N.Y. 1991) .........................................................................28

*DirecTV Latin Am., LLC v. Park 610, LLC*,
   691 F. Supp. 2d 405 (S.D.N.Y. 2010)....................................................................20

*Dogan v. Harbert Const. Corp.*,
   507 F. Supp. 254 (S.D.N.Y. 1980) .........................................................................20

*Eades v. Kennedy, PC Law Offices*,
   799 F.3d 161 (2d Cir. 2015)...................................................................................25

*Ehrenfeld v. Mahfouz*,
   489 F.3d 542 (2d Cir. 2007)...................................................................................10

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ................................................15, 21

*GFRE, Inc. v. U.S. Bank, N.A.*,
   130 A.D.3d 569 (2nd Dep't. 2015) ........................................................................40

*Griffin v. Sirva, Inc.*,
   835 F.3d 283 (2d. Cir. 2016)..................................................................................37

*Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*,
   138 F. Supp. 2d 449 (S.D.N.Y. 2000)......................................................................3

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)..........................................................................................24, 25

*Karic v. Major Auto. Companies Inc.*,
   992 F. Supp. 2d 196 (E.D.N.Y. 2014) ...................................................................35

*Karoon v. Credit Suisse Grp. AG*,
   2016 WL 815278 (S.D.N.Y. Feb. 29, 2016)..........................................................10

*Landoil Resources Corp. v. Alexander & Alexander Services., Inc.*,
   918 F.2d 1039 (2d Cir. 1990).................................................................................19

*Lawrence v. Int. Bus. Mach. Corp.*,
   2017 WL 3278917 (S.D.N.Y. Aug. 1, 2017)....................................................37, 38

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013).................................................................................25

*Mandarin Trading, Ltd. v. Wildenstein*,
  16 N.Y.3d 173 (N.Y. 2011) ...............................................................................40

*Matusovsky v. Merrill Lynch*,
  186 F. Supp. 2d 397 (S.D.N.Y. 2002)................................................................27

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996).................................................................................25

*NLRB v. Solid Waste Servs., Inc.*,
  38 F.3d 93 (2d Cir. 1994)...................................................................................37

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987)..............................................................................................24

*Opinion Corp. v. Roca Labs, Inc.*,
  2015 WL 405532 (S.D.N.Y. Jan. 30, 2015) ................................................15, 16

*Ortiz v. Guitian Bros. Music, Inc.*,
  2008 WL 4449314 (S.D.N.Y. Sep. 29, 2008)...........................................15, 21, 22

*Ox v. Union Cent. Life Ins. Co.*,
  1995 WL 634991 (S.D.N.Y. Oct. 27, 1995) ......................................................39

*Parke–Bernet Galleries v. Franklyn*,
  26 N.Y.2d 13 (1970) ..........................................................................................13

*Paterno v. Laser Spine Inst.*,
  24 N.Y.3d 370 (N.Y. 2014) ...............................................................................21

*Pieczenik v. Cambridge Antibody Tech. Group*,
  2004 WL 527045 (S.D.N.Y. Mar. 16, 2004) .....................................................14

*R.B. Ventures, Ltd. v. Shane*,
  112 F.3d 54 (2d Cir. 1997)..................................................................................38

*Rapoport v. Asia Elecs. Holding Co.*,
  88 F. Supp. 2d 179 (S.D.N.Y. 2000)..................................................................27

*Reers v. Deutsche Bahn AG*,
  320 F. Supp. 2d 140 (S.D.N.Y. 2004).........................................................10, 24

*Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*,
  192 F. Supp. 3d 348 (S.D.N.Y. 2016)................................................................40

*Salinas v. Starjem Restaurant Corp.*,
  123 F. Supp. 3d 442 (S.D.N.Y. 2015).....................................................................34

*Spanierman Gallery, PSP v. Love*,
  2003 WL 22480055 (S.D.N.Y. Oct. 31, 2003) .......................................................33

*Stemcor USA, Inc. v. Sharon Tube Co.*,
  2001 WL 492427 (S.D.N.Y. May 8, 2001) .............................................................20

*In re Terrorist Attacks on Sept. 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y. 2005).....................................................................11

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)....................................................................................24

*Thomas v. Ashcroft*,
  470 F.3d 491 (2d Cir. 2006)....................................................................................10

*Three Five Compounds, Inc. v. Scram Techs., Inc.*,
  2011 WL 5838697 (S.D.N.Y. Nov. 21, 2011) .......................................................16

*TransformaCon, Inc. v. Vista Equity Partners, Inc.*,
  2015 WL 4461769 (S.D.N.Y. July 21, 2015) ...................................................28, 33

*V Cars, LLC v. Israel Corp.*,
  902 F. Supp. 2d 349 (S.D.N.Y. 2012)..........................................................14, 18, 19

*Viropro, Inc. v. Pricewaterhousecoopers Advisory Services Sdn Bhd*,
  2016 WL 225686 (S.D.N.Y. Jan. 19, 2016) ...........................................................20

*In re Vivendi Universal, S.A.*,
  2004 WL 876050 (S.D.N.Y. Apr. 22, 2004).............................................................39

*Williams v. Victoria's Secret*,
  2017 WL 384787 (S.D.N.Y. Jan. 27, 2017) ...........................................................37

*Wiwa v. Royal Dutch Petroleum Co.*,
  226 F.3d 88 (2d Cir. 2000)............................................................13, 16, 18, 19, 20

*World–Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)............................................................................................25, 26

*Zheng v. Liberty Apparel Co.*,
  355 F.3d 61 (2d Cir. 2003)...........................................................................36, 37, 38

*Zito v. Fischbein, Badillo, Wagner & Harding*,
  35 A.D.3d 306 (1st Dep't. 2006) ............................................................................38

**Rules**

CPLR § 301(a)(1) ................................................................................................................14

CPLR § 302(a) ...............................................................................................11, 12, 15, 16, 24

CPLR § 302(a)(1) ...........................................................13, 14, 15, 16, 18, 19, 20, 21

Fed. R. Civ. P. 4 ..............................................................................................................24

Fed. R. Civ. P. 11(c)(3) .....................................................................................................32

Fed. R. Civ. P. 12(b)(2) .................................................................................................1, 3

Fed. R. Civ. P. 12(b)(5).....................................................................................................24

Fed. R. Civ. P. 12(b)(6)....................................................................................1, 26, 27, 40

Fed. R. Civ. P. 26(a)(1) .....................................................................................................31

Fed. R. Civ. P. 26(a)(1)(A)(iii) .........................................................................................31

Defendants Compass Partners International, LLP and Compass Partners International II, LLP (the "UK Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss Plaintiff's Second Amended Complaint [Docket No. 87] (the "SAC") pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6), for lack of personal jurisdiction and failure to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

When stripped of its extraneous and conclusory allegations, the SAC asserts nothing more than a garden-variety employment dispute involving breach of contract and wage claims. The parties which hired Plaintiff, paid his salary and allegedly entered into and breached the contracts at issue have answered the SAC and are prepared to proceed with the litigation. Nonetheless – and disregarding the Court's advice for no apparent reason[1] – Plaintiff has once again attempted to drag into this case foreign entities that are not subject to jurisdiction in this forum, never employed Plaintiff and are not alleged to have entered into any contracts with or made any promises to him. To further this end, Plaintiff continues his improper practice of lumping all the defendants together and referring to all of them as a single, undifferentiated entity, ignoring the Court's explicit order to the contrary. *See* Docket No. 84, ¶ 5 ("If plaintiff chooses to amend the FAC, it cannot, without a proper predicate, refer to 'Compass' as an undifferentiated entity that encapsulates all defendants."). Highlighting the absurdity of this approach, in the First Amended Complaint Plaintiff insisted that he was "employed" by, among others, two Jersey, UK-based investment partnerships. *See*  First Amended Complaint, Docket

---

[1]  At oral argument on the previous round of motions to dismiss, the Court, addressing Plaintiff's counsel, stated: "I strongly advise you if you feel that you have a sustainable cause of action against the three defendants who have answered, just stick with that.  There is no indication that they couldn't answer a judgment and there is no indication they couldn't give complete relief."  Transcript of hearing dated August 22, 2017 at 28:19-23, attached as Ex. F to the Declaration of Tony Miodonka, Esq. (the "Miodonka Decl.")

No. 45 at ¶ 121.   Now that those entities have been dismissed from the case, Plaintiff has moved on, now insisting that he was actually "employed" by, among others, the UK Defendants.

Like before, Plaintiffs' claims against the foreign entities are subject to dismissal.  The UK Defendants have limited and insufficient contacts with New York, and those contacts that are alleged are entirely unconnected to Plaintiff's claims.  Thus, there is no basis under New York's long-arm statute for the Court to exercise personal jurisdiction over these entities, and doing so would also violate due process.

Furthermore, the SAC is devoid of any plausible, non-conclusory factual allegations that support Plaintiff's claims against the UK Defendants.  The SAC fails to offer a single allegation sufficient to establish that the UK Defendants ever employed Plaintiff – directly or jointly – or entered into any contracts with him.  In fact, this claim is actually contradicted by Plaintiff's own evidence.  For example, it is undisputed that the UK Defendants are not parties to the very contracts which form the core of Plaintiff's claims, and Plaintiff's own contemporaneous emails belie several of his key allegations.

For the second time in the course of this litigation, Plaintiff has, without any basis, forced entirely foreign entities to suffer the expense, burden and inconvenience of defending themselves in a foreign tribunal which does not have jurisdiction over them, against claims which are objectively baseless as a matter of law.  The Court should once again reject these tactics, dismiss the SAC against the UK Defendants, and compel Plaintiff to do what he is apparently unwilling to do on his own: move this case forward against the domestic parties who have answered the complaint and are ready to engage on the merits.

## BACKGROUND

**I.**       **History of the Compass "Brand"**[2]

The Compass "brand" name originated with two separate entities founded by Defendant

Stephen Waters and two other individuals.  *See* Declaration of Anthony Marraccino, previously

filed at Docket No. 66 ("2017 Marraccino Decl.") at ¶ 6.[3]  The first entity bearing the Compass

name (the "Advisory Entity") was a mergers and acquisitions business founded in 1996 which

had operations in the United States and Europe.  2017 Marraccino Decl. ¶ 7.  The second entity

bearing the Compass name was a private equity fund (the "PE Entity") founded in 1998 which

operated almost exclusively in Europe.  *Id*., ¶ 8.  Although the Advisory Entity and PE Entity

shared common ownership and similar names, they were at all times legally and operationally

distinct from each other.  *Id*., ¶ 9.

In 2002, Mr. Waters assumed 100% ownership of the Advisory Entity and since that time

has managed and controlled it and its successors which, on information and belief, include

defendants Compass Advisers Group, LLC, and Compass Partners Advisors, LLP (collectively,

the "Domestic Entities").  *Id*., ¶ 11.  The PE Entity was dissolved and liquidated in 2013.  *Id*., ¶

12.  Two years later, a new private equity entity, Compass Partners Investments Master Fund LP

(the "Master Fund"), was formed to acquire certain assets of another, unrelated private equity

fund located in Europe (this business transaction was referred to internally as "Project Penguin").

*Id*., ¶ 13.  The Master Fund has different investors and general partners than the PE Entity.  The

---

[2]  This background information is necessary because in the SAC, Plaintiff continues to conflate various entities based on little more than their common use of the "Compass" trade name.  Because such information is directly relevant to the question of personal jurisdiction over the UK Defendants, it is both necessary and appropriate for the Court to consider this information at this stage of the case.  *See Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 138 F. Supp. 2d 449,  452 (S.D.N.Y. 2000) ("In deciding a motion to dismiss pursuant to Rule 12(b)(2), . . . a court may consider matters outside the pleadings without converting the motion to dismiss into a motion for summary judgment"); *Alpha Capital Anstalt v. Oxysure Systs., Inc.*, 252 F. Supp. 3d 332, 337 (S.D.N.Y. 2017) (same).

[3]  The 2017 Marraccino Declaration was submitted in connection with the Motion to Dismiss filed by Compass Partners Investments Master Fund LP and Compass Partners Investments Co-Invest Fund LP [Docket No. 63].  The Court granted this motion by Order dated August 29, 2017  Docket No. 84.

Master Fund and several of its affiliates – including the UK Defendants – used the Compass

name because it was a name familiar to investors and the market generally.  *Id.*, ¶ 15.

## II.  **The UK Defendants**

Defendant Compass Partners International, LLP ("CPI") is a limited partnership

organized and existing under the laws of the United Kingdom, with its principal place of

business in London, England.  *See* Declaration of Anthony Marraccino dated January 4, 2018,

filed herewith ("2018 Marraccino Decl.") at ¶ 5; SAC, ¶ 12.  CPI was created in 2006 to serve as

the investment adviser for the PE Entity, and in that capacity was registered with the Financial

Conduct Authority ("FCA").[4]  2018 Marraccino Decl., ¶ 6.  As of June 2017, CPI is in

liquidation. *Id.*, ¶ 8.  CPI has not been operating since it was placed into liquidation and does not

hold and has never distributed any carried interest.  *Id.*, ¶ 9.  Other than the claims in this

litigation, all other matters in CPI's liquidation have been resolved. *Id.*, ¶ 10.

Defendant Compass Partners International II, LLP ("CPI II") is a limited partnership

organized and existing under the laws of the United Kingdom, with its principal place of

business in London, England.  *Id.*, ¶ 5; SAC, ¶ 14.  CPI II was established in October, 2015 as

part of a private equity acquisition that closed in February 2016. 2018 Marraccino Decl., ¶ 11.

This is the acquisition referred to above as "Project Penguin."  CPI was the FCA appointed

representative of CPI II until October 2016, when CPI II became fully FCA-authorized. *Id.*, ¶¶

13-14.  CPI II is currently the FCA-registered investment adviser for the Co-Invest Fund

(described below).  *Id.*, ¶ 15.  Neither of the UK Defendants has ever been entitled to receive or

distribute any carried interest.  *Id.*, ¶¶ 41-42.

Unlike the Domestic Entities, which have historically used the trade name "Compass

Advisers" to refer to their collective business operation, the name "Compass Advisers" has never

---

[4]  The FCA is a quasi-governmental entity which regulates financial services firms and financial markets in the UK,
similar to FINRA in the United States.  2018 Marraccino Decl., ¶ 7.

been used to refer to the UK Defendants, which are commonly referred to by the trade names "Compass Partners" or "Compass Partners International." *Id.*, ¶ 18.

### III.    Relationship Among the UK Defendants, the Delaware Defendants and Plaintiff

The use of the Compass name in connection with the UK Defendants and several of their affiliated entities was not intended to, and does not, imply any legal, financial, administrative or operational relationship between those entities and the Domestic Entities or Mr. Waters.  2018 Marraccino Decl., ¶ 19.  Notwithstanding their common use of the name "Compass," the UK Defendants have no formal or legal relationship with the Domestic Entities and, as described below, only a limited connection to Defendant Waters.  *Id.*, ¶ 20.  In fact, the UK Defendants are legally, financially, administratively and operationally separate and distinct from the Domestic Entities.  *See* Declaration of Frank Rudd filed herewith ("Rudd Decl."), ¶ 29.  The UK Defendants do not own, and are not owned by, the Domestic Entities.  Rudd Decl., ¶ 30.

#### A.    Waters' Interest in the UK Defendants

Through a UK-based entity which he owns and/or controls (SWSW Limited), Mr. Waters has an indirect interest in CPI.  *Id.*, ¶ 24; 2018 Marraccino Decl., ¶ 27.  The remainder of CPI's capital ownership is divided among several individual members.  *Id.*, ¶ 28.  While each of CPI's members – including SWSW Limited – has significant discretion over their own proportional share of any distribution made by CPI, they possess no individual authority or control over each other's' respective membership interests or distributions in the entity.  *Id.*, ¶ 29.

Mr. Waters has an indirect, minority capital interest in CPI II, but he does not share in that entity's profits.  Rudd Decl., ¶ 26.  Other than his indirect interest in CPI and his minority interest in CPI II, Mr. Waters does not have any other interest in the UK Defendants.  2018 Marraccino Decl., ¶ 33.  Apart from Mr. Waters' interests, the UK Defendants do not share

owners, partners or officers with the Domestic Entities, nor do these entities share any premises. *Id.*, ¶¶ 34-35.

B.   Project Penguin

The assets acquired in the Project Penguin transaction are held in the Master Fund. 2018 Marraccino Decl., ¶ 38. The carried interest income generated by those assets flows to one of the Master Fund's limited partners, a Jersey, UK based investment partnership known as Compass Partners Investments Co-Invest Fund LP (the "Co-Invest Fund"). *Id.*, ¶ 39. This is the carried interest a portion of which Plaintiff claims Mr. Waters offered him. SAC, ¶ 26. CPI II does not own and is not entitled to any of the carried interest received by the Co-Invest Fund. 2018 Marraccino Decl., ¶ 41. CPI has no relationship with the Co-Invest Fund. *Id.*, ¶ 40. Neither Plaintiff nor the Domestic Entities played any role in the consummation of the Project Penguin transaction. Rudd Decl., ¶ 41; Marraccino Decl. ¶ 37. The Master Fund and the Co-Invest Fund were previously named as defendants in this case, and were dismissed by order of the Court dated August 29, 2017. [Docket No. 84]

Mr. Waters is a limited partner in the Co-Invest Fund. *See* Declaration of John-Paul Meagher, dated April 17, 2017, previously filed at Docket No. 65 ("Meagher Decl."), ¶ 20. He invested in the Master Fund and the Co-Invest Fund as an individual, and not on behalf of the Domestic Entities. *Id.*, ¶ 27. In his capacity as a limited partner of the Co-Invest Fund, Mr. Waters signed the Co-Invest Fund Limited Partnership Agreement (the "Partnership Agreement"), a contract dated February 4, 2016, which was created in and is governed by the laws of Jersey, UK. *Id.*, ¶ 31. The Partnership Agreement expressly restricts the transfer of the limited partners' interests in the Co-Invest Fund to third parties without the consent of the fund's general partner. *Id.*, ¶ 32. Consistent with the limitations set forth in the Partnership Agreement, Mr. Waters could, under certain circumstances, transfer some or all of his minority

interest in the Co-Invest Fund to one or more third parties.  *Id.*, ¶ 33.  The Partnership Agreement does not allow Mr. Waters to transfer the interests or rights of the other limited partners in the Co-Invest Fund to any third parties, nor does the Partnership Agreement grant Mr. Waters the authority to legally bind the Co-Invest Fund (or the Master Fund) in any way.  *Id.*, ¶ 34.

**IV.**     **The UK Defendants' Limited Contacts With New York and Plaintiff**

The UK Defendants have minimal contacts with New York.  They do not have any offices or employees in New York, do not maintain any bank accounts or other assets in New York, and do not own or lease any real property in the State.  2018 Marraccino Decl., ¶ ¶ 23-25. The UK Defendants also had limited contact with Plaintiff in New York, and they neither employed nor entered into any contracts with him.  Rudd Decl., ¶¶ 44-49.  In his capacity as an employee of the Domestic Entities, Plaintiff briefly consulted with individuals associated with the UK Defendants regarding potential investment opportunities and attempted to assist the UK Defendants in identifying new investors and evaluating possible investment targets.  *Id.*, ¶ 38. These preliminary efforts did not lead anywhere.  *Id.*, ¶ 41.

Plaintiff was directed to assist certain entities, including CPI, by Mr. Waters and/or the Domestic Entities in the context of an arm's length consulting relationship.  *Id.*, ¶¶ 32-38.  On or about August 30, 2013, the individual partners in an unrelated Delaware limited liability partnership ("Delco"), including Mr. Waters (but not Mr. Franklin, who was not a partner in Delco), entered into a non-binding Memorandum of Understanding (the "MOU") concerning, among other things, the Domestic Entities' provision of investment banking and similar services to Delco and/or one or more of its affiliates.[5]  *Id.*, ¶ 32.  This MOU, to which the UK Defendants were not a party, was governed by Delaware law.  *Id.*, ¶ 33.

---

[5]   Several of the individual partners of Delco were also affiliated with the UK Defendants.  Rudd Decl., ¶ 32.

The parties to the MOU agreed that the Domestic Entities would assist Delco in identifying potential new investment opportunities.  *Id.*, ¶ 36.  In exchange for this assistance, the Domestic Entities were eligible to earn compensation in connection with completed transactions.  *Id.*, ¶ 36.  It was in this context that Plaintiff Craig Franklin – and other employees of the Domestic Entities – consulted with individuals at Delco (and later CPI) to assist them in identifying and evaluating potential investment opportunities.[6]  *Id.*, ¶ 38.  Mr. Waters was free to allocate any fees or other compensation earned by the Domestic Entities under the MOU at his discretion, including to the Domestic Entities' employees.  *Id.*, ¶ 37.

Although the Domestic Entities arranged several meetings with potential investors and investment targets in connection with the MOU – some of which took place in New York and involved Plaintiff – these meetings were preliminary and exploratory in nature and never led to a consummated transaction.  *Id.*, ¶¶ 40-41.  In fact, the Domestic Entities never served as investment banker for Delco or the UK Defendants on a completed transaction, and neither Delco nor the UK Defendants has ever paid the Domestic Entities a fee under the MOU.  *Id.*, ¶ 41.  Delco was liquidated in December 2016.  *Id.*, ¶ 35.

## PROCEDURAL HISTORY

This lawsuit was originally commenced in December, 2016.  Docket No. 1.  In March, 2017, after motions to dismiss were filed by the U.S.-based defendants, Plaintiff filed a First Amended Complaint (the "FAC").  Docket No. 45.  Both the original and First Amended complaints named the Master Fund and the Co-Invest Fund (together, the "Jersey Defendants") as defendants.  Several of the putative defendants named in the FAC thereafter filed motions to dismiss, including: the Jersey Defendants; Waters International, LLC; Compass Advisers Group LLC; Compass Group Holding LLC; Compass Advisor Holdco LLC; and Compass Partners

---

[6]  It is also in this context that, at times, CPI has referred to Compass Advisers' employees such as Mr. Franklin in its marketing materials.  Rudd Decl., ¶ 39.

Advisors, LLP.  Defendants Stephen Waters, Compass Partners Advisors, LLP and Compass Advisers Group LLC answered the FAC.

Following oral argument on August 22, 2017, the Court issued an Order dismissing the FAC on several grounds.  Docket. No. 84 (the "Order").  In the Order, the Court dismissed the FAC against all of the organizational defendants for lack of subject matter jurisdiction based on Plaintiff's failure to identify the citizenship of the respective partners and members of each of these entities.  Order, ¶ 1.  The Court also dismissed the FAC for failure to allege a sufficient basis for personal jurisdiction over the Jersey Defendants, and dismissed it against Compass Group Holding LLC and Compass Advisor Holdco LLC based on its finding that those entities "are not legal entities capable of being sued."  Order at ¶¶ 2, 3.  The Court concluded that the FAC stated a claim against the answering defendants, but cautioned Plaintiff that "the fact that Waters may have owned the defendant companies does not allow plaintiff to pierce their corporate veils." Order, ¶ 4.

The Court granted Plaintiff leave to amend the FAC to attempt to address the foregoing issues, providing that "[i]f plaintiff chooses to amend the FAC, it cannot, without a proper predicate, refer to 'Compass' as an undifferentiated entity that encapsulates all defendants. Plaintiff must make clear which claims are alleged against which defendants and the terms of each alleged contract."  Order, ¶ 5.  On October 6, 2017, Plaintiff filed a Second Amended Complaint.  Docket No. 87.  The SAC dropped several of the original defendants – including the Jersey Defendants – but added two new foreign defendants: CPI and CPI II.  *Id.*  The other remaining defendants answered the SAC, much as they had answered the FAC.  Docket Nos. 92-94.

9

# ARGUMENT

## I.  The Court Lacks Personal Jurisdiction Over the UK Defendants

The SAC is devoid of well-pleaded allegations that would support the Court's exercise of personal jurisdiction over the UK Defendants.  "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006).  In order to make a prima facie showing of personal jurisdiction, three elements must be established: "(1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction; and (3) accordance with constitutional due process principles."  *Karoon v. Credit Suisse Grp. AG*, 2016 WL 815278, at *2 (S.D.N.Y. Feb. 29, 2016) (citations and internal quotation marks omitted).  When a plaintiff has failed to meet its *prima facie* burden, the court may grant a defendant's motion to dismiss and deny jurisdictional discovery.  *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) (affirming district court's denial of jurisdictional discovery and dismissal of plaintiff's claims).[7]

The Court must consider both New York and federal law in order to determine whether personal jurisdiction exists over the UK Defendants.  "A federal court sitting in diversity must apply the law of the forum state in determining whether it may exercise personal jurisdiction over an out-of-state defendant.  If the applicable statute of the forum state allows the court to exercise personal jurisdiction, the court must then determine whether the [federal] constitutional standards of due process are met."  *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 149 (S.D.N.Y. 2004) (citations omitted).  "Federal courts look to the long-arm statute of the forum

---

[7]  The Second Circuit has also suggested that jurisdictional discovery may be denied when a complaint lacks "legally sufficient allegations of jurisdiction[.]" *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007).  Whichever standard this Court applies, it is clear that Plaintiff has not come close to the threshold necessary to warrant jurisdictional discovery.

state in order to determine whether a statutory basis for asserting jurisdiction exists." *Byun v. Amuro*, 2011 WL 10895122, at *3 (S.D.N.Y. Sept. 6, 2011).

In deciding a pre-discovery motion to dismiss for lack of personal jurisdiction, "a district court has considerable procedural leeway, and may look to evidence outside the pleadings." *Id*, at *2 (citations and internal quotation marks omitted). Moreover, "[alt]hough doubts are resolved in plaintiff's favor, conclusory allegations lacking factual specificity do not satisfy plaintiff's burden of putting forward a prima facie showing that jurisdiction exists. Plaintiff's unsupported allegations can be rebutted by direct, highly specific, testimonial evidence[.]" *Id*. at *3 (citations and internal quotation marks omitted); *see also In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 804 (S.D.N.Y. 2005) (in considering motion to dismiss for lack of personal jurisdiction, court will not "accept legally conclusory assertions or draw argumentative inferences" in favor of plaintiff (internal quotation marks omitted; subsequent history omitted)). In this case, the UK Defendants have submitted just such "direct, highly specific" evidence, in the form of the Rudd and Marraccino Declarations, and ask that the Court consider this evidence as a dispositive rebuttal to Plaintiff's "unsupported allegations" of personal jurisdiction.

A.   Standard for Exercising Personal Jurisdiction Over the Jersey Defendants Under New York's Long-Arm Statute

Plaintiff's allegations clearly fail to satisfy New York's long-arm statute.

1.   New York's Long-Arm Statute, CPLR § 302(a)

Once again, Plaintiff's complaint fails to state explicitly the purported basis for personal jurisdiction over a pair of indisputably foreign entities. Nor does the SAC identify the specific facts upon which Plaintiff relies in alleging personal jurisdiction over the UK Defendants.[8] The

---

[8]   In response to an earlier motion to dismiss, Plaintiff argued that he is not required to state with specificity which facts he claims support personal jurisdiction. Docket No. 73 at 19. Even assuming that this is an accurate statement of the law, it is contrary to this Court's explicit instruction at the previous motion to dismiss hearing that "[p]ersonal jurisdiction must be alleged. It hasn't been alleged sufficiently . . . **the acts of jurisdiction on which**

UK Defendants are left to assume for purposes of this motion that Plaintiff is relying on New York's long-arm statute, New York Civil Practice Law and Rules ("CPLR") § 302(a), which provides in relevant part:

> [A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:
>
> 1.  transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2.  commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3.  commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>
>    (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
>    (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
>
> 4.  owns, uses or possesses any real property situated within the state.

*Id.* The New York long-arm statute is more restrictive than the Constitutional due process requirement. "It is well established that Rule 302(a) does not extend New York's long-arm jurisdiction to the full extent permitted by the Constitution." *Arch Specialty Insurance Co. v. Entertainment Specialty Ins. Services, Inc.*, 2005 WL 696897, at *5 (S.D.N.Y. Mar. 24, 2005) (citation and internal quotation marks omitted).

---

the **plaintiff would base a complaint against [a foreign company] must be alleged**[.]"  *See* Ex. F to the Miodonka Decl. at 21:13-14; 22: 1-2, (emphasis added).

2.     Transacting Business in New York Under CPLR § 302(a)(1)

Because the Complaint does not assert any tort claims,[9] and does not allege that the UK

Defendants "use or possess any real property" in New York, the only potential basis for long-arm

jurisdiction over these defendants is under CPLR § 302(a)(1).  In assessing whether a putative

defendant "transacts any business" within New York for purposes of CPLR § 302(a)(1), courts in

the Second Circuit employ a "totality of the circumstances" standard.  *See Bank Brussels*

*Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999).  However, as this

Court has repeatedly noted, "New York courts have cautioned . . . that 'defendants, as a rule,

should be subject to suit where they are normally found, that is, at their pre-eminent

headquarters, or where they conduct substantial business activities. **Only in a rare case should**

**they be compelled to answer a suit in a jurisdiction with which they have the barest of**

**contact**.' " *Aquiline Capital Partners LLC v. FinArch LLC*, 861 F. Supp. 2d 378, 386 (S.D.N.Y.

2012) (emphasis added; citations and internal quotation marks omitted)

In order to be subject to personal jurisdiction under CPLR § 302(a)(1), a defendant must

have purposefully availed itself of the privilege of the benefits and protections of New York's

laws.  "Not all purposeful activity, however, constitutes a 'transaction of business' within the

meaning of Section 302(a)(1).  Rather, contacts with New York have been found to sustain

personal jurisdiction only where a 'defendant's direct and personal involvement . . . on his own

initiative . . . project[ed] himself' into New York to engage in a '**sustained and substantial**

**transaction of business**.'"  *Aquiline Capital Partners* LLC, 861 F. Supp. 2d at 386 (emphasis

added) (quoting *Parke–Bernet Galleries v. Franklyn,* 26 N.Y.2d 13, 18 (1970)); *see also Wiwa v.*

*Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (in order to satisfy CPLR §

---

[9]   As against the UK Defendants, the SAC alleges one cause of action for breach of contract (Count 1), two causes
of action alleging statutory violations (Counts 4-5) and one quasi-contractual cause of action (Count 6).

302(a)(1), "a plaintiff must show that a defendant engaged in **continuous, permanent, and substantial activity** in New York" (emphasis added; internal quotation marks omitted)).

In analyzing whether personal jurisdiction exists under CPLR § 302(a)(1) – particularly in actions alleging breach of contract – courts have also considered whether a putative defendant has an ongoing contractual relationship with a New York domiciliary, and whether such contract was negotiated or executed in New York and whether such putative defendant attended follow-up meetings in New York concerning the contract:

> In determining whether an out-of-state defendant has transacted business in New York within the meaning of CPLR § 302(a)(1), the Second Circuit has considered, *inter alia*, "'whether the defendant has an on-going contractual relationship with a New York corporation, . . . [and] whether the contract was negotiated or executed in New York, and whether after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship . . . .'"

*V Cars, LLC v. Israel Corp.*, 902 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (quoting *Aquiline Capital Partners LLC,* 861 F.Supp.2d at 386).  However, the "mere existence of a contract with a New York corporation is not sufficient to constitute the transaction of business" under CPLR § 301(a)(1).  *Aquiline Capital Partners* LLC, 861 F. Supp. 2d at 387 (citing *Pieczenik v. Cambridge Antibody Tech. Group*, 2004 WL 527045, at *4 (S.D.N.Y. Mar. 16, 2004)).

Similarly, while a putative defendant's meetings in New York may be considered under the long-arm statute, this Court has made clear that "exploratory, unproductive or insubstantial" meetings taking place in New York are not a sufficient basis for personal jurisdiction.  *Benson & Assocs., Inc. v. Orthopedic Network of New Jersey*, 1998 WL 388531, at *4 (S.D.N.Y. July 13, 1998); *see also V Cars, LLC*, 902 F. Supp. 2d at 361 ("exploratory meetings taking place in New York, leading to nothing more than a proposal that was itself the subject of further negotiations over the phone, by mail, and in meetings outside New York, are not sufficient contacts to

constitute the transaction of business within the meaning of CPLR 302(a)(1)" (internal quotation marks omitted)).

3.     Claim Must "Arise From" Defendant's Transaction of Business in New York

Additionally, CPLR § 302(a) provides that, in order for personal jurisdiction to exist under any of its subsections – including § 302(a)(1) – the plaintiff's cause(s)[10] of action must "aris[e] from" the putative defendant's contacts with the forum.  CPLR § 302(a); *see also Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) ("[f]or a court to exercise jurisdiction under this provision [CPLR § 302(a)(1)], the claim must 'arise from' the transaction of business within the state").  Interpreting this requirement, the Second Circuit has stated that: "A claim 'arises out of' a defendant's transaction of business in New York when there exists a **substantial nexus** between the business transacted and the cause of action sued upon."  *Id.*, at 31 (emphasis added; internal quotation marks omitted); *see also FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *5 (S.D.N.Y. Aug. 18, 2017) (Hellerstein, J.) ("The exercise of specific jurisdiction thus depends on in-state activity that *gave rise to the episode-in-suit*." (internal quotation marks omitted)); *Opinion Corp. v. Roca Labs, Inc.*, 2015 WL 405532, at *3 (S.D.N.Y. Jan. 30, 2015) ("the cause of action [must] arise out of the enumerated act that provides a nexus to New York").

Applying this requirement, courts in this District have regularly declined to exercise personal jurisdiction over a foreign party whose contacts with New York did not have a "substantial nexus" to the plaintiff's claims.  *See*, *e.g.*, *FrontPoint Asian Event Driven Fund,*

---

[10] Under CPLR § 302(a)(1), a plaintiff must independently establish personal jurisdiction over *each* defendant for *each* cause of action. *Ortiz v. Guitian Bros. Music, Inc.*, 2008 WL 4449314, at *8 (S.D.N.Y. Sep. 29, 2008) (Under CPLR § 302(a)(1), "[t]he court must determine the issue of personal jurisdiction separately for each cause of action and for each defendant.") (internal quotation marks and citation omitted).

*L.P.*, 2017 WL 3600425, at *5-6; *Opinion Corp.*, 2015 WL 405532, at *4; *Three Five Compounds, Inc. v. Scram Techs., Inc.*, 2011 WL 5838697, at *13 (S.D.N.Y. Nov. 21, 2011).

      B.    <u>The UK Defendants Do Not Transact Business In New York</u>

Applying these standards to this case, it is readily apparent that the UK Defendants do not "transact[] any business" in New York for purposes of CPLR § 302(a)(1).  The SAC simply fails to allege that either of the UK Defendants "engaged in continuous, permanent, and substantial activity in New York."  *Wiwa*, 226 F.3d at 95.  Nor does the SAC allege any facts from which the Court could plausibly *infer* that the UK Defendants engage in the sort of "sustained and substantial" activity in New York that is required to satisfy CPLR § 302(a)(1).

As a matter of fact, the UK Defendants have no relevant connections to New York. These foreign entities are not registered to do business in New York and do not have any offices or employees in the State.  2018 Marraccino Decl., ¶¶ 22, 24.  They do not maintain any bank accounts, own or lease any real property, or have an interest in any other assets located in New York. *Id.*, ¶¶ 23, 25.  They are not parties to any material contracts in New York and have not purposefully availed themselves of the benefits and protections of New York's laws.  Rudd Decl., ¶ 20.  Accordingly, there is no basis under CPLR § 302(a) for this Court to assert personal jurisdiction over the UK Defendants.

The allegations purportedly establishing the basis for exercising personal jurisdiction over CPI and CPI II appear to be confined to Paragraphs 13 and 15, respectively, of the SAC.[11] First, Plaintiff alleges that the UK Defendants "employed Franklin's services in New York [] and transacted business – both related to Franklin's work and otherwise – in New York."  SAC, ¶ 13.

---

[11]The allegations in Paragraph 15 against CPI II are even more threadbare than those found in Paragraph 13 against CPI. Nonetheless, because the allegations in these paragraphs are substantially similar and to avoid repetitive arguments, this section will focus on those set forth in Paragraph 13.  To be clear, however, the arguments set forth in this section apply equally to the allegations against both of the UK Defendants.

In support of this conclusory allegation, Plaintiff refers to Exhibit J to the SAC, which is nothing more than a printout of an old webpage displaying Plaintiff's bio stating that he joined "Compass" in 2012.  Even if true, the fact that Plaintiff may have been briefly referenced on a website affiliated with the UK Defendants is insufficient to establish the existence of an employment relationship – or any other sufficient contact with New York – and is, therefore, irrelevant for purposes of personal jurisdiction.  *See* 2018 Marraccino Decl., ¶¶ 49-50, 58 (explaining the reference to Plaintiff on the UK Defendants' website and noting that such reference was deleted in early 2014 when the UK Defendants notified the Domestic Entities – Mr. Franklin's employer(s) – that it no longer required his investment consulting services.)

Put simply, Exhibit J is not probative of (i) whether the UK Defendants "employed" Mr. Franklin, (ii) whether they employed him in New York, or (iii) whether the UK Defendants transacted any "other[]" business in this forum.  Moreover, other, more specific allegations and evidence attached to the SAC – including no fewer than four alleged contracts and two paystubs, none of which so much as mention the UK Defendants – fatally undermine the allegation that the UK Defendants "employed" Plaintiff in any capacity.  *See* SAC, ¶ 11 and Exhibits A, B, D, and E.  As discussed in detail in Section II(C) below, it is impossible to conclude from the Plaintiff's allegations that the UK Defendants employed Plaintiff – or anyone else – in New York.[12]  As a result, personal jurisdiction over these entities cannot be premised on the unsupported allegation that the UK Defendants "employed" Plaintiff in the forum.

Apparently recognizing the deficiency of this allegation, Plaintiff also alleges that Franklin Rudd (among others) on behalf of CPI "executed multiple agreements with entities in New York to evaluate those entities for potential private equity investment, including consenting

---

[12] The allegation that all of the defendants "jointly employed" Plaintiff will be addressed in Section II(C)(2), below.

to the jurisdiction of the courts of New York with respect to those agreements."[13]  SAC, ¶ 13.

Notably, the SAC does not identify a single such contract or alleged New York counterparty and

does not allege where such contracts were negotiated, executed and/or performed.  The SAC also

does not allege that any such contracts developed into an "ongoing contractual relationship with

a New York corporation[.]"  *Agency Rent A Car Sys., Inc.*, 98 F.3d at 29.  Nor does the SAC

allege that CPI or any of its purported agents, after allegedly entering into such contracts, ever

"visited New York for the purpose of meeting with parties to the contract regarding the

relationship[.]"  *V Cars, LLC*, 902 F. Supp. 2d at 361.  Thus, this allegation alone is clearly

insufficient to establish that the UK Defendants "transact[] . . . business" in New York within the

meaning of CPLR § 302(a)(1).  *See Agency Rent A Car Sys., Inc.*, 98 F.3d at 29 (listing the

foregoing factors as relevant to the analysis under CPLR § 302(a)(1) when a contractual

relationship is alleged to constitute the basis for personal jurisdiction over a foreign defendant).

   Indeed, Plaintiff appears to acknowledge that any "contracts" entered into by the UK

Defendants with a New York entity were preliminary and non-substantive.  *See* SAC, ¶ 13

(alleging that CPI entered into contracts with "entities in New York **to evaluate** those entities for

**potential** private equity investment" (emphasis added)).  As a matter of fact, the contracts

referred to in Paragraph 13 were Non-Disclosure Agreements ("NDA's") which were standard

documents, not subject to meaningful negotiation, and which were executed either in

Connecticut or in the United Kingdom.  Rudd Decl., ¶¶ 17, 18; *see also* SAC, ¶ 39, note 4

(alleging that CPI entered into NDA's with companies in New York in order to "evaluate

potential investments in those companies").  Standing alone, such NDA's do not (and cannot, by

their very nature) create the kind of "continuous, permanent, and substantial activity"; *Wiwa*, 226

F.3d at 95; required to satisfy CPLR § 302(a)(1).  The Plaintiff does not allege that such NDA's

---

[13] The SAC does not allege that CPI II entered into any such contracts.

ever led to a business transaction (much less one with a substantial nexus to New York), and Mr. Rudd has affirmed that none of these documents ever led to a consummated transaction.  Rudd Decl., ¶ 20.

Next, the SAC alleges that Mr. Rudd, on behalf of CPI, "would routinely go to meetings with Franklin as part of the team to evaluate potential investments, complete due diligence on investments, and meet with investors in New York on behalf of" CPI.[14]  SAC, ¶ 13.  Again, Plaintiff fails to allege that any of these meetings – which are alleged to have been preliminary meetings to "evaluate" potential investments – ever developed into the kind of "continuous, permanent, and substantial activity" required to satisfy CPLR § 302(a)(1).  *Wiwa*, 226 F.3d at 95; *See also Landoil Resources Corp. v. Alexander & Alexander Services., Inc.*, 918 F.2d 1039, 1045 (2d Cir. 1990) (foreign entity had insufficient contact with New York for purposes of personal jurisdiction despite several trips to New York by its representatives to solicit new business because such trips were of short duration, occurred sporadically, and involved various customer accounts).  In fact, these meetings were preliminary and exploratory in nature, and never led to a consummated business transaction or other substantial or continuous relationship between CPI and a New York domiciliary.  Rudd Decl., ¶¶ 40-41.  As this Court has repeatedly declared, "exploratory meetings taking place in New York, leading to nothing more than a proposal that was itself the subject of further negotiations over the phone, by mail, and in meetings outside New York, are not sufficient contacts to constitute the transaction of business within the meaning of CPLR 302(a)(1)" (internal quotation marks omitted).  *V Cars, LLC*, 902 F. Supp. 2d at 361.  Since the SAC merely alleges that CPI's representative attended exploratory meetings in New

---

[14] The SAC does not allege that anyone ever attended any such meetings on behalf of CPI II.

York to "evaluate potential investments," this allegation alone cannot justify the exercise of

personal jurisdiction over CPI under CPLR § 302(a)(1).[15]

Finally, the SAC alleges that Mr. Rudd "works out of" the New York offices of the

"Defendants."  Even if that vague and conclusory allegation were true, the fact that a single

representative of a foreign defendant conducts some unspecified work out of an office in New

York does not establish that the UK Defendants transact business in the State within the meaning

of CPLR § 302(a)(1).  *See Dogan v. Harbert Const. Corp.*, 507 F. Supp. 254, 261 (S.D.N.Y.

1980) ("New York law is clear that physical presence alone cannot transform business dealings

into business transactions" sufficient to satisfy CPLR § 302(a)(1)); *DirecTV Latin Am., LLC v.*

*Park 610, LLC*, 691 F. Supp. 2d 405, 422 (S.D.N.Y. 2010) (same).  The SAC is devoid of any

allegations concerning the nature, frequency or quantity of the work allegedly conducted by Mr.

Rudd out of a New York office, and does not allege any facts tending to establish that such work

constitutes "continuous, permanent, and substantial activity" required to satisfy CPLR §

302(a)(1).  *Wiwa*, 226 F.3d at 95.  This is just the sort of "limited" contact which courts have

found insufficient to satisfy CPLR § 302(a)(1).  *See, e.g., Stemcor USA, Inc. v. Sharon Tube Co.*,

2001 WL 492427, at *2 (S.D.N.Y. May 8, 2001) (motion to dismiss based on lack of personal

jurisdiction granted because plaintiff's allegations "too insubstantial to reflect degree of

permanent and substantial activity required under [New York's long-arm statute]"); *Viropro, Inc.*

*v. Pricewaterhousecoopers Advisory Services Sdn Bhd*, 2016 WL 225686, at *5 (S.D.N.Y. Jan.

19, 2016) (no personal jurisdiction where Plaintiff had alleged nothing more than

"communications of [an] unspecified type or number" between parties).  In any event, Mr. Rudd

attests that he works out of his home office in Connecticut, has not had an office in New York

---

[15] Plaintiff also alleges, in conclusory fashion, that Mr. Waters is one of CPI's "principal agents."  SAC, ¶ 13.  There are no factual allegations from which the Court could conclude that Mr. Waters was an agent for CPI, much less that he was acting as such during these alleged, unspecified "meetings."  In addition to being conclusory, this allegation is implausible for the reasons discussed in Section II(B)(2), below.

for many years, and has never had an office at the offices of the Domestic Entities in New York. Rudd Decl., ¶¶ 12-13.

Taken together, the foregoing allegations fall far short of making a *prima facie* showing of personal jurisdiction under CPLR § 302(a)(1).  Even accepting as true all well-pleaded allegations, the SAC does not establish that the UK Defendants transact any material business in New York, much less that they engage in the substantial and continuous level of activity necessary to subject these foreign defendants to personal jurisdiction in this forum.

C.     The UK Defendants' Alleged Contacts With New York are Unrelated to Plaintiff's Claims

Even assuming that the SAC alleges that the UK Defendants have sufficient contacts with New York such that CPLR § 302(a)(1) can be satisfied, the SAC certainly does not allege that such contacts have anything to do with Plaintiff's claims.  As noted above, "[w]hether a non-domiciliary is transacting business within the meaning of CPLR 302(a)(1) . . . requires a finding that the non-domiciliary's activities were purposeful and established **a substantial relationship between the transaction and the claim asserted**."  *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 376 (N.Y. 2014) (citations and internal quotation marks omitted; emphasis added); *see also FrontPoint Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *5 (in-state activity is only relevant to personal jurisdiction if plaintiff's claims arise from such activity).  Because Plaintiff must establish that such a "substantial relationship" exists for each cause of action; *see Ortiz*, 2008 WL 4449314, at *8; each cause of action asserted against the UK Defendants in the SAC is considered independently below.

Plaintiff's First Cause of Action alleges various breaches of Plaintiff's employment agreement, including the alleged failure of the "Defendants" to pay Plaintiff "required bonuses" and to give him a raise in pay.  SAC, ¶¶ 109-110.  Plaintiff further alleges that the collective "Defendants" breached his employment agreement by failing to abide by other promises of

21

compensation, including compensation in the form of a portion of the carried interest income generated by Project Penguin and "equity in the Defendants[.]" *Id.*, ¶¶ 112-113.

Setting aside the conclusory allegation that the UK Defendants "employed Franklin's services in New York" – which is addressed below – the UK Defendants' alleged contacts with New York have nothing to do with the breach of contract claim alleged in the First Cause of Action. Plaintiff alleges that CPI[16] signed contracts with unspecified third party New York entities in order to evaluate potential investment opportunities. SAC, ¶ 13. The SAC does not allege that these contracts had anything to do with Plaintiff's employment contract or the alleged breach of that contract or any other promise allegedly made to him. Similarly, the SAC alleges that Mr. Rudd attended meetings with unspecified third parties in New York to discuss potential investment opportunities. *Id.* Plaintiff does not allege that these meetings had anything to do with the alleged breaches described in the First Cause of Action. In fact, Mr. Rudd states that he never attended any meetings in New York with the purpose of discussing the specific terms of Plaintiff's employment, and that Plaintiff was never involved in a meeting that led to a consummated transaction. Rudd Decl., ¶¶ 15, 41. In short, Plaintiff's First Cause of Action does not "arise from" the UK Defendants' alleged contacts with New York and, therefore, such contacts cannot sustain personal jurisdiction over these defendants. *Agency Rent A Car Sys., Inc.*, 98 F.3d at 29 ("For a court to exercise jurisdiction under this provision, the claim must 'arise from' the transaction of business within the state.").

Plaintiff's Fourth Cause of Action alleges that the UK Defendants failed to pay him wages in violation of the New York Labor Law §§ 190, *et seq*. Setting aside the baseless and conclusory allegation that all of the Defendants collectively "employed" Plaintiff – which is addressed in Section II(C)(2) below – this count is based on the same alleged conduct as the First

---

[16] As noted above, the SAC does not allege that CPI II ever signed any contracts or attended any meetings in New York.

Cause of Action, *i.e.*, the "Defendants'" alleged failure to pay Plaintiff certain promised compensation. Thus, for the same reasons that the First Cause of Action does not "arise from" or have a "substantial relationship" with the UK Defendants' alleged contacts with New York, such contacts cannot support the exercise of personal jurisdiction with respect to the Fourth Cause of Action.

For like reasons, the Fifth and Sixth Causes of Action must be dismissed as well. The Fifth Cause of Action alleges "retaliation" in violation of the New York Labor Law. This claim is based on the allegation that the "Defendants" terminated Plaintiff in response to his complaints about their failure to pay him agreed-upon wages. However, there is no allegation that the UK Defendants were even aware of such complaints, much less that the alleged retaliation for such complaints – Plaintiff's termination by the Domestic Entities – has a "substantial relationship" with the UK Defendants' limited contacts exploring potential investment opportunities in New York. Nor is the false allegation that Mr. Rudd "works out of" the Domestic Entities' office in New York in any way relevant to Plaintiff's retaliation claim. In fact, Mr. Rudd attests that the UK Defendants had no role in the Domestic Entities' decision to terminate Plaintiff's employment. Rudd Decl., ¶ 48.[17] The Sixth Cause of Action – for unjust enrichment – must be dismissed because it, too, does not "arise from" any of the UK Defendants alleged contacts with New York. The SAC does not allege that the UK Defendants were "enriched" in any way by their contacts with Plaintiff or the Domestic Entities in New York. As noted above, none of the preliminary meetings in New York or the NDA's with New York entities ever led to a consummated transaction, nor does the SAC allege how the UK Defendants were supposedly enriched as a result of their minimal contacts with New York. Rudd Decl., ¶ 41.

---

[17] Indeed, the UK Defendants had not had any meaningful contact with Plaintiff for well-over a year before he was terminated by the Domestic Entities. 2018 Marraccino Decl., ¶ 54.

Since none of the Causes of Action asserted against the UK Defendants "arose from" or has a "substantial relationship" with the UK Defendants' limited alleged contacts with New York, such claims cannot satisfy CPLR § 302(a) and must be dismissed for lack of personal jurisdiction under State law.

D.  Exercising Personal Jurisdiction Over the UK Defendants Would Violate <u>Due Process Under the U.S. Constitution</u>

Because Plaintiff has failed to satisfy New York's long-arm statute, the Court need not consider whether exercising personal jurisdiction over the UK Defendants would comport with due process under the U.S. Constitution. *Reers*, 320 F. Supp. 2d at 149. In any event, for similar reasons, exercising personal jurisdiction over the UK Defendants would violate due process.[18]

1.  Constitutional Standard

Plaintiff has the burden of establishing that the Court has personal jurisdiction over a foreign defendant by demonstrating that the defendant has "reached out" to the forum state sufficiently to satisfy due process. "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673-74 (2d Cir. 2013) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."

---

[18] Notably, Plaintiff has failed to file an affidavit or any other proof of proper service on the UK Defendants as required by Rules 4(l)(1) & (2) of the Federal Rules of Civil Procedure. A plaintiff bears the burden of establishing sufficient service of process before a federal court may exercise personal jurisdiction over a defendant. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co*., 484 U.S. 97, 104 (1987); *Cassano v. Altshuler*, 186 F.Supp.3d 318, 320 (S.D.N.Y. 2016) ("[T]he plaintiff bears the burden of establishing that service was sufficient"). Since Plaintiff has submitted no evidence of sufficient service, and the UK Defendants have not waived service, Plaintiff cannot satisfy this burden and Rule 12(b)(5) provides an additional and independent basis for dismissal of the SAC. The UK Defendants assert that Plaintiff's service was insufficient and reserve all rights with respect thereto.

*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

Due process requires, *inter alia*, that a putative defendant have sufficient contacts with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. Foreseeability is crucial to the minimum contacts analysis, and a defendant's "conduct and connection with the forum" must be "such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Even if a court finds that defendant's conduct meets the threshold for minimum contacts, it must still ask whether "the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' – that is, whether it is reasonable under the circumstances of the particular case." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (quoting *Int'l Shoe*, 326 U.S. at 316).

Applying these standards to the UK Defendants, it is clear that Plaintiff cannot satisfy his burden of establishing that the Court may properly exercise personal jurisdiction over these defendants.

### 2.    The UK Defendants Have Only Limited Contacts With New York

Apart from the Plaintiff's vague and conclusory attempt to conflate entirely unrelated entities based on nothing more than the similarity in their names, the SAC does not allege that the UK Defendants have any relevant contacts with New York that would support the exercise of personal jurisdiction over these entities. As discussed above, the SAC merely alleges that one representative of the UK Defendants occasionally entered New York for the purpose of attending exploratory meetings, and that the UK Defendants entered into NDA's with one or more

unidentified New York entities.[19]  Such negligible contacts – which have nothing to do with

Plaintiff's alleged grievances – fall far short of establishing that the UK Defendants have

"reached out" to New York in any way, much less that they have sufficient contacts with the

State "such that [they] should reasonably anticipate being haled into court there."  *World–Wide*

*Volkswagen*, 444 U.S. at 297.  This pleading deficiency is fatal and requires dismissal of the

Complaint against the Jersey Defendants for lack of personal jurisdiction.

As discussed above, the UK Defendants simply do not have any material contacts with

New York.  Among other things, these entities do not have any employees or offices in New

York, do not own or lease any real property in New York, and do not maintain any bank

accounts in New York.  Marraccino Decl., ¶¶ 23-25.  Moreover, the UK Defendants never

employed Plaintiff, never entered into any contracts with Plaintiff, never made any promises to

Plaintiff, and do not have any relevant connections to those entities which Plaintiff alleges did

these things. Rudd Decl., ¶¶ 21, 29, 44.  Simply put, due process and "traditional notions of fair

play and substantial justice" compel the conclusion that there is no Constitutional basis for this

Court to exercise personal jurisdiction over the UK Defendants.

## II.     The Complaint Fails To State a Claim Against the UK Defendants

Even if the Court were to determine that it can exercise personal jurisdiction over the UK

Defendants, the Complaint must be dismissed under Rule 12(b)(6) because it fails to state any

viable claims against such Defendants.

### A.     Rule 12(b)(6) Standard

The standard of review under Rule 12(b)(6) is well-established.  A complaint's well-pled,

non-conclusory factual allegations must "state a claim to relief that is plausible on its face" by

creating a "reasonable inference that the defendant is liable for the misconduct alleged."

---

[19] As noted elsewhere and discussed in detail below, the SAC fails sufficiently to allege that the UK Defendants "employed" Plaintiff.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A complaint does not state a claim by making allegations that are "merely consistent with" a defendant's liability, or that raise a "sheer possibility" that a defendant has acted unlawfully.  *Id.  See also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 557 (2007) ("labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[,]" nor will "naked assertion[s]" "without some further factual enhancement").  Where, as here, the allegations fail to state a claim upon which relief can be granted as to certain defendants, the complaint against such defendants must be dismissed.

In deciding a motion to dismiss under Rule 12(b)(6), the Court may consider documents attached to the complaint or incorporated into it by reference.  "[A] court may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading."  *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).  Indeed, "where allegations set out in the complaint are contradicted by other matters asserted or by materials attached to or incorporated by reference in the complaint, the Court is not obliged to credit the allegations in the complaint." *Brown v. New York City Hous. Auth.*, 2006 WL 1378599, at *1 (S.D.N.Y. May 17, 2006); *see also Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (where "documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint").  As noted above and below, many of Plaintiff's key allegations are contradicted by documents and other materials which the Court may properly consider in connection with a 12(b)(6) motion.

B.      The SAC Fails to State a Claim
        for Breach of Contract Against the UK Defendants

In the First Cause of Action, the SAC asserts that the UK Defendants are liable to

Plaintiff under a breach of contract theory.  However, there is not a single well-pleaded, non-

conclusory allegation in the SAC to support such a claim.

1.      The UK Defendants Are Not Parties to the Allegedly
        Breached Contracts and are Therefore Not Bound by Them

Plaintiff's breach of contract claim against the UK Defendants is foreclosed under New

York law because the SAC does not allege that the UK Defendants entered into — much less

breached — *any* contract with Plaintiff.  The First Cause of Action as against the UK Defendants

must, therefore, be dismissed.

Under New York law, a breach of contract claim requires (1) a valid contract; (2)

plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the

breach." *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, 2015 WL 4461769, at *3 (S.D.N.Y.

July 21, 2015) (internal quotation marks and footnote omitted).  "A breach of contract claim that

fails to allege facts sufficient to show that an enforceable contract existed between the parties is

subject to dismissal." *Id.* (internal quotation marks and footnotes omitted).  Absent extraordinary

circumstances not present here, only signatories or assignees of a contract may be liable for its

alleged breach.[20]  *See Crabtree v. Tristar Automotive Grp., Inc.*, 776 F. Supp. 155, 166

(S.D.N.Y. 1991) ("[i]t is hornbook law that a non-signatory to a contract cannot be named as a

---

[20] These circumstances involve parent corporations being held liable as a party to a subsidiary's contract where "the parent's conduct manifests an intent to be bound by the contract, which intent is inferable from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes.  *TransformaCon, Inc.*, 2015 WL 4461769, at *3.  The SAC does not allege that the UK Defendants and the Domestic Entities have a parent-subsidiary relationship, and there are no facts alleged that would support the notion that the Domestic Entities are a "dummy" for the UK Defendants or that they control the Domestic Entities for their own purposes.  In fact, Plaintiff alleges the opposite – that Mr. Waters and/or the Domestic Entities control the UK Defendants for their own purposes.  SAC, ¶ 13, note 2.

defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract."). Here, the SAC does not allege that the UK Defendants signed any of the contracts at issue, or that such contracts were subsequently assigned to these entities. This is fatal to Plaintiff's breach of contract claim against the UK Defendants and warrants its dismissal.[21]

To distract the Court from this fatal pleading defect, Plaintiff relies on several inapposite documents attached to the SAC. For example, relying on Exhibit A, Plaintiff alleges that "Waters, on behalf of himself . . . and [the UK Defendants] . . . offered Franklin employment" SAC ¶ 99. Plaintiff's reliance on Exhibit A is misplaced. Exhibit A is nothing more than an email chain between Plaintiff and individuals at the Domestic Entities which attaches a draft term sheet concerning Plaintiff's potential employment by the Domestic Entities. Most notably, the UK Defendants are not mentioned in the documents and no one from those entities is even copied on the email exchange. Further, not only does Exhibit A not support the notion that Mr. Waters had authority to bind the UK Defendants, or that he had any intent to do so, but it fails to provide any basis to conclude that the UK Defendants intended or agreed to be bound by its terms. Simply put, it is impossible to conclude from Exhibit A that Mr. Waters offered Plaintiff employment "on behalf of" the UK Defendants. *See In re Alcatel Securities Lit.*, 382 F. Supp. 2d 513, 535 (S.D.N.Y. Feb. 28, 2005) (courts ought not have to "connect-the-dots" in plaintiff's complaint).[22]

Plaintiff also relies on Exhibit A to claim that not only did Mr. Waters offer him employment on behalf of the UK Defendants, but also that the carried interest that Mr. Waters allegedly offered him by way of that document "was not limited to Defendant Waters' portion

---

[21] Plaintiff alleges that all of the Defendants jointly employed him. SAC, ¶¶ 18, 38. This allegation is discussed in detail in Section II(C)(2) below. Suffice it to say that this allegation is also conclusory and without factual support, and certainly cannot sustain the breach of contract claim against the UK Defendants.

[22] Plaintiff has failed to heed the Court's warning that conclusory allegations are insufficient to establish that a defendant is a party to an enforceable contract. *See* Ex. F to Miodonka Decl. at 25:13–21.

specifically and ***included the portion of the carry that the other Defendants were to receive as
well***." SAC, ¶ 26 (emphasis in original).  This allegation appears to be based on the proposal in
Exhibit A that Plaintiff would receive "5% of Firm/SW carry for each entity."  SAC, Ex. A, ¶ D.
Without any factual support, Plaintiff speculates that the term "Firm" in Exhibit A means "the
Compass Entities" – itself a vague an undefined term – and thus that Mr. Waters was offering
Plaintiff a portion of the carried interest allegedly owned by, among others, the UK Defendants.
SAC, ¶ 26.  This allegation is vague, conclusory and directly contradicted by Plaintiff's own
contemporaneous and subsequent statements.

To wit: In response to the Jersey Defendants' Motion to Dismiss the prior complaint,
Plaintiff submitted a sworn declaration.  Docket No. 74.  Attached as Exhibit 3 to that
declaration is an email exchange which, according to Plaintiff, concerns "carried interest income
he was to receive *for his work for the Jersey Defendants*."  Docket No. 74 at 6 (emphasis added).
Now, of course, Plaintiff takes the position that Mr. Waters' purported offer of carried interest
was made on behalf of *all* of the Defendants, including the UK Defendants, and that he is
entitled to a portion not only of Mr. Waters' carried interest, but all of the other Defendants' as
well.  SAC, ¶ 26.  The email attached to Plaintiff's declaration makes abundantly clear, however,
that Mr. Waters offered the carried interest on ***his own*** behalf, and nowhere in the email is the
carried interest referred to as compensation for any work done for the Jersey Defendants or any
other foreign entity.  Indeed, Mr. Waters clearly states in the email: "I've funded the aggregate
commitment, so US participants will effectively defund me."  *See* Docket No. 74, Ex. 3.

In a subsequent email, which was attached to the Declaration of Anthony Marraccino
submitted in support of the Jersey Defendants' reply memorandum (Docket No. 80, the "Reply
Decl."),[23] Plaintiff clearly expressed his understanding that it was Mr. Waters – and not the UK

---

[23] For the Court's convenience this email is also attached as Exhibit A to the 2018 Marraccino Declaration.

Defendants or anyone else – who was offering him the carried interest, and that such interest was derived from Waters' personal investment in the Jersey Defendants. Reply Decl., Ex. A (remarking about Mr. Waters' offer, Plaintiff wrote: "I just spoke with Steve [Waters] about participating [in the Co-Invest Fund] (**through a portion of his position he offered me and some of the Group here at Compass**)" (emphasis added).   This email demonstrates conclusively that, contrary to his allegations in the SAC, Plaintiff understood (i) that Mr. Waters was making the offer, (ii) that any carried interest Plaintiff was offered was limited to a "portion of his [Waters'] position" and (iii) that there is a clear and meaningful distinction between the "Compass" "Group" he worked for and the foreign defendants.  *Id.*

It gets worse.  On August 1, 2017, Plaintiff served his initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.  *See* Exhibit G attached to the Miodonka Decl. In the section of these disclosures in which Plaintiff sets forth his damages calculation pursuant to Rule 26(a)(1)(A)(iii), he claims to be entitled to "5% of Defendants' 10%" of the carried interest.  *Id.* at 16.  Not coincidentally, Mr. Waters has an approximately 10% interest in the Co-Invest Fund (the entity which holds the Project Penguin carried interest). Reply Decl., ¶ 10.  In other words, in his *own* damages calculation, Plaintiff concedes that he is only entitled to 5% of Mr. Waters' 10% of the Project Penguin carried interest.  If he truly believed that Mr. Waters was offering him 5% of "the portion of the carry the other Defendants were to receive as well," why would Plaintiff claim an entitlement only to a small piece of Mr. Waters' portion of the carry (a mere 0.5% of the total), rather than 5% of <u>all</u> of the carry?  The answer is as straightforward as it is troubling: Plaintiff knows – as expressed in his own words in the email discussed above – that Mr. Waters was offering him only "a portion of his [Waters'] position" in

the Project Penguin carried interest, and nevertheless he falsely alleged something completely different in the SAC.[24]

Exhibit B to the SAC is also of no use.  According to Plaintiff, Exhibit B supports the allegation that the UK Defendants "acknowledged the terms of the contract multiple times during the course of Franklin's employment"  SAC ¶ 101; *see also* SAC, ¶ 24 ("Waters and others confirmed these terms of employment multiple times during Franklin's employment" (referring to Exhibit B)).  But Exhibit B plainly does no such thing.  It is a form document on "Compass Advisers" letterhead which appears to set forth certain terms related to Plaintiff's employment with the Domestic Entities.  Once again, the document itself makes no mention of the UK Defendants and the SAC does not allege that the UK Defendants were even aware of this document, much less that they intended to be bound by it.

Similarly, Exhibits D and E of the SAC – documents which Plaintiff alleges memorialize additional (broken) promises made to him by "Defendants" – are written on Compass Advisers letterhead and signed by Mr. Waters in his capacity as "Managing Partner [of] Compass Advisers Group, LLC."  Again, these documents do not mention the UK Defendants, and there is nothing in these documents from which the Court can infer that the UK Defendants intended or agreed to be bound by the alleged promises made therein.  *Id.*  In short, the documents attached to the SAC simply do not support the conclusory assertion that Mr. Waters or the Domestic Entities either intended or were authorized to make any offers or promises to Plaintiff on behalf of the UK Defendants.[25]

---

[24] The UK Defendants request that the Court consider sanctioning these false representations under Rule 11(c)(3) of the Federal Rules.

[25] In support of their jurisdictional arguments, several representatives of the UK Defendants have attested that these entities never employed Plaintiff or entered into any contracts with him whatsoever.  Rudd Decl., ¶¶ 21, 44.   Not only are these statements undisputed, they are consistent with the documents attached to the Complaint on which Plaintiff himself relies so heavily.

2.      <u>There is No Basis for Conflating All of the Defendants</u>

Plaintiff attempts to elide the plain fact that the UK Defendants are not parties to any of the alleged contracts by lumping entirely unrelated entities together without any factual basis for doing so, and ignoring the distinct corporate identities of the named defendants.  In other words, Plaintiff hopes that the Court will simply treat all of the defendants as one and the same and ignore the identity of the actual parties to the allegedly-breached contracts.  The Court was not impressed with this gambit when it dismissed the First Amended Complaint, and it should reject it here as well.  The Court's August 29, 2017 Order explicitly directed Plaintiff not to conflate the various defendant entities without a proper factual basis.  *See* Order, ¶ 5 ("If plaintiff chooses to amend the FAC, it cannot, without a proper predicate, refer to 'Compass' as an undifferentiated entity that encapsulates all defendants.").  In drafting the SAC, Plaintiff disregarded the Court's instruction, continuing to lump all of the defendants together without a sufficient factual predicate for doing so.

In any event, Plaintiff's attempts at obfuscation are futile.  Because there was never a valid contract between Plaintiff and the UK Defendants – and no plausible allegation of such– the SAC fails to state a claim for breach of contract against these entities under New York law.  *See Transformacon, Inc.*, 2015 WL 4461769, at *3; *Spanierman Gallery, PSP v. Love*, 2003 WL 22480055, at *3 (S.D.N.Y. Oct. 31, 2003) (motion to dismiss granted because "[t]he complaint combines the Signatory and Non-Signatory Defendants under the name 'Defendants,' and alleges, in essence, that these 'Defendants' failed to fulfill their contractual obligations").

In like fashion, Plaintiff also persists in baselessly alleging that Mr. Waters was a "principal agent" of the UK Defendants who was authorized to, and in fact did, bind the UK Defendants to an enforceable contract with Plaintiff.  SAC ¶¶ 13, 99, 104.  Plaintiff fails to plead any specific facts or produce any relevant documents to support this theory.  In fact, the

documents attached to the SAC undermine this conclusory allegation.  *See, e.g.*, SAC, Exhibits A, D, E, and F (no mention of CPI or CPI II).  Moreover, the allegation that Mr. Waters was an "agent" of the UK Defendants is implausible, as it is contradicted and critically undermined by Plaintiff's allegations that Mr. Waters dominates and controls the finances and management of all of the Defendants, including the UK Defendants.  SAC, ¶ 13, note 2; ¶ 41.  These are not the actions of an "agent."

Finally, the mere allegation of common ownership and direction of the various entities by Mr. Waters cannot make the UK Defendants liable for the alleged breach of contracts to which they are strangers.  The Court recognized this principle at the August 22, 2017 hearing on the prior defendants' motions to dismiss, noting: "Much of what is alleged here is that[,] based on common ownership by Waters and direction by Waters, the corporate form can be disregarded.  **That is not true with respect to the contract claims**."  *See*  Ex. F to Miodonka Decl. at 23:11–14.

Plaintiff has failed to plead a viable breach of contract claim against the UK Defendants.  Resting on nothing more than conclusory and unsubstantiated allegations, Count One, as against the UK Defendants, should be dismissed.

C.      The SAC Fails to State a Claim Against the UK Defendants for Violations of New York Labor Law

The statutory claims set forth in Counts Four and Five suffer from the same fatal defect: there is no allegation that the UK Defendants *actually employed* Plaintiff.  Indeed, other than the entirely conclusory – and flawed – proposition that all of the Defendants "jointly" employed Plaintiff,  there is not a single allegation in the SAC from which one can reasonably infer that Plaintiff had any employment relationship with the UK Defendants whatsoever.  Thus, because there is no plausible basis to conclude that the UK Defendants "employed" Plaintiff, they cannot be liable for any violation of New York's Labor Laws (the "NYLL") with respect to such

employment.  *Salinas v. Starjem Restaurant Corp.*, 123 F. Supp. 3d 442, 465 (S.D.N.Y. 2015)

(CEO could not held liable because she was "not Plaintiffs' employer under the FLSA or the

NYLL.").  For this reason, the Fourth and Fifth Causes of Action must be dismissed as against

the UK Defendants.

> 1.   There is No Allegation From Which the Court Can Conclude That
> The UK Defendants Employed Plaintiff

New York courts "look to a four-factor 'economic reality' test to determine whether [the]

definition [of employer under the NYLL] has been met—namely whether the alleged employer

(1) had the power to hire and fire the employees; (2) supervised and controlled employee work

schedules or conditions of employment; (3) determined the rate and method of payment; (4) and

maintained employment records."  *Karic v. Major Auto. Companies Inc.*, 992 F. Supp. 2d 196,

203 (E.D.N.Y. 2014) (internal quotation marks omitted).

The SAC does not sufficiently allege that the UK Defendants were Plaintiff's "employer"

under the NYLL.  Not only does the SAC fail to address any of the aforementioned factors, but it

relies on documents that undermine the notion that the UK Defendants employed Plaintiff.  *See*

*e.g.* SAC, Ex. B (correspondence from **Compass Advisers** containing terms of employment); *Id.*

at Ex. D and E (correspondence from **Compass Advisers Group, LLC** addressing Plaintiff's

compensation); and *Id.* at Ex. F (Plaintiff's earnings statements issued by **Compass Advisers**

**Group LLC** and **Compass Partners Advisors LLP**).  Dealing a further blow to Plaintiff's

narrative, co-defendant Stephen Waters, in his Answer to the SAC [Docket No. 92 ], admits that

"Compass Advisors Group, LLC hired Plaintiff" and that "Plaintiff received compensation from

Compass Advisers Group, LLC and Compass Partners Advisors, LLP." *See id.* at ¶ 56.  This is

consistent with Mr. Rudd's statement that the UK Defendants never employed Plaintiff.[26]  Rudd

Decl., ¶ 45.

> 2.    Plaintiff's Allegations Do Not Establish a Joint Employment Relationship

In an effort to side-step this hurdle, Plaintiff asserts that all of the Defendants were his

joint employers. *See* SAC, ¶¶ 18, 38.  This remarkable proposition similarly fails as a matter of

law because the SAC does not allege facts that would remotely support the application of the

joint employment concept to the UK Defendants in this case.

To determine whether joint employer status is present, New York courts have developed

a six-factor analysis that considers the "circumstances of the whole activity, viewed in light of

economic reality." *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d Cir. 2003)[27] (citation and

internal quotation marks omitted).  Pursuant to this test, to establish that the UK Defendants were

his joint employers, Plaintiff must show, at a minimum, that: (1) he worked predominantly for

the UK Defendants, as the alleged joint employers; (2) the permanence or duration of a working

relationship with the UK Defendants; (3) the use of the UK Defendants' premises or equipment;

(4) the extent of control exercised by the UK Defendants; (5) that he was an integral part of the

UK Defendants' business; and (6) that he could shift from one putative joint employer to

another.  *Id*.

The SAC does not allege that Plaintiff worked predominantly for the UK Defendants, that

he had any sort of permanent relationship with them, or that he was "integral" to their business.[28]

---

[26] This testimony, as well as other evidence discussed in this Section, is relevant to the question of personal jurisdiction and is, therefore, properly before the Court.  *See Byun*, 2011 WL 10895122, at *2.

[27] In *Zheng*, the Second Circuit Court of Appeals appeared to acknowledge that this analysis may also be applied to claims arising under New York Labor law in addition to claims advanced under the Fair Labor Standards Act.

[28] To the extent that Plaintiff had any relationship with the UK Defendants, it was limited both substantively and temporally.  *See* 2018 Marraccino Decl. at ¶¶ 49-50, 54; Rudd Decl. ¶¶ 44-49.  In fact, rather than being "integral" to the UK Defendants' business, Plaintiff never assisted the UK Defendants in consummating a business transaction.  Rudd Decl. ¶ 41.

The SAC also fails to allege that Plaintiff's employment was largely controlled by the UK Defendants, or that Plaintiff regularly used the UK Defendants' premises or equipment.  Indeed, the SAC does not allege that Plaintiff ever set foot in the UK Defendants' premises in England. Plaintiff could not make these allegations because he knows they would be untrue.  *See* Rudd Decl., ¶¶ 45–50 (the UK Defendants had no control over the terms and conditions of Plaintiff's employment with the Domestic Entities, and did not have the power to hire or fire him).

Consistent with *Zheng*, the Second Circuit has explained that the cornerstone of joint employment is "immediate control" over employees. *See Lawrence v. Int. Bus. Mach. Corp*., 2017 WL 3278917, at *5 (S.D.N.Y. Aug. 1, 2017) ("[i]mmediate control over the employees is an essential element of any joint employer determination" (internal quotations omitted)); *Griffin v. Sirva, Inc.*, 835 F.3d 283, 292 (2d. Cir. 2016) ("A joint employer relationship may be found to exist where there is sufficient evidence that the [putative joint employer] had immediate control over the other company's employees" (quoting *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994)); *Williams v. Victoria's Secret*, 2017 WL 384787, at *6 (S.D.N.Y. Jan. 27, 2017) (joint employment determination requires "sufficient evidence of immediate control over the employees." (citations omitted")).  In *Carter v. Dutchess Community College*, 735 F.2d 8, 13–15 (2d Cir. 1984), the Second Circuit Court of Appeals evaluated the following factors to determine whether an entity possesses the requisite control over workers to establish joint employer status: (1) the power to hire and fire; (2) supervisory control over work schedules; (3) determination of the rate and method of payment; and (4) maintenance of employment records. *Id.* at 13–15.

The SAC makes no attempt to allege that the UK Defendants exercised the requisite level of "immediate control" over Plaintiff that might establish a joint employment relationship. Plaintiff stops short of alleging that the UK Defendants had the power to hire and fire him, that they controlled his work schedule, that they determined his rate and method of compensation, or

that they maintained his employment records.  In fact (as Plaintiff surely knows), the UK Defendants did none of these things.  Rudd Decl., ¶¶ 45-50.  Instead, Plaintiff offers only distracting and irrelevant allegations – such as, that he interviewed with the UK Defendants (SAC, ¶ 32), had an annual performance review prepared by the UK Defendants (*Id.*, ¶ 33), and at times took directions from the UK Defendants (*Id.*, ¶ 2).  Based on nothing more than these misleading and legally insufficient allegations (*see* Rudd Decl., ¶¶ 50-57), Plaintiff assigns the UK Defendants the title of joint employers.[29]

Because the SAC fails to allege any facts plausibly establishing that the UK Defendants employed Plaintiff (directly or jointly), Counts 4 and 5 must be dismissed as to these Defendants.

### D.   The SAC Fails to State a Claim for Unjust Enrichment

The SAC asserts a claim for *quantum meruit* and unjust enrichment against all of the Defendants.  *Am. Compl.* at ¶¶ 163 – 171.  This claim fails as a matter of law for two reasons: (1) there is no bona fide dispute that a valid and enforceable contract governs the underlying subject matter; and (2) assuming *arguendo* that there is a bona fide dispute, the SAC fails to allege facts sufficient to establish the requisite elements for a claim for unjust enrichment.  Consequently, the Sixth Cause of Action should be dismissed against the UK Defendants.

#### 1.   There is no Bona Fide Dispute About the Existence of a Valid and Enforceable Contract

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v Long Is. R. Co.*, 70 NY. 2d 382, 388 (N.Y. 1987).[30]  "A quasi

---

[29] Plaintiff cannot avoid the import of the *Zheng* or *Carter* factors by resorting to group pleading.  That is, he cannot add color to his claim against the UK Defendants simply by referring to their alleged actions as having been taken by *all* defendants.  *See Lawrence*, 2017 WL 3278197, at *6 (where plaintiff repeatedly pled that various actions were taken by "defendants," the court concluded that "group pleading will not suffice").

[30] This principle extends to oral agreements. *See Zito v. Fischbein, Badillo, Wagner & Harding*, 35 A.D.3d 306 (1st Dep't. 2006).

contract only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Id.  See also R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997) ("non-contractual equitable remedies … are inapplicable if there is an enforceable contract governing the subject matter."); *Bellino Schwartz Padob Advert., Inc. v. Solaris Mktg. Grp., Inc*., 222 A.D.2d 313, 313 (1st Dep't. 1995) (valid and enforceable contract precludes quasi-contractual claims against third party non-signatories).

While the existence of a valid and enforceable contract generally precludes a claim in quasi contract, "unjust enrichment may be alleged alongside breach of contract claims **when the validity of the contract is called into question**." *In re Vivendi Universal, S.A*., 2004 WL 876050, at *12 (S.D.N.Y. Apr. 22, 2004) (emphasis added).  A bona fide dispute regarding the validity of a contract occurs when, for example, plaintiff alleges fraudulent inducement or rescission. *Id*. (unjust enrichment and breach of contract claims allowed to co-exist because factual issue remained as to enforceability of contract); *Ox v. Union Cent. Life Ins. Co*., 1995 WL 634991, at *6 (S.D.N.Y. Oct. 27, 1995) (same).

Here, in contrast, Plaintiff does not allege that there is a bona fide dispute regarding the enforceability of the underlying contract(s).  Attached to the SAC are no fewer than three written agreements which Plaintiff contends constitute enforceable contracts.  *See* SAC, Exhibits A, D and E.[31]  This is not a case where the plaintiff is calling into question the validity of the contracts (as in *Vivendi Universal, supra*), nor have any of the answering Defendants explicitly denied that these agreements are enforceable (although presumably these Defendants have other defenses to Plaintiff's claims of breach).  Pursuant to New York law, therefore, Plaintiff's claim for *quantum*

---

[31] Two of these documents are signed by both contracting parties, while the third (Ex. A) includes an email exchange which appears to memorialize an offer an acceptance.

*meruit* and unjust enrichment cannot coexist with his breach of contract claims and should be dismissed.

### 2.    Plaintiff Fails to Sufficiently Allege Unjust Enrichment

Even if Plaintiff is allowed to include a quasi-contractual claim alongside his breach of contract claims, there is another compelling reason to dismiss the Sixth Cause of Action: this claim fails to sufficiently allege the requisite elements of a claim for unjust enrichment and therefore cannot pass muster under Rule 12(b)(6).

Under New York law, to recover for unjust enrichment, a plaintiff must allege: "(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *GFRE, Inc. v. U.S. Bank, N.A.*, 130 A.D.3d 569, 569 (2nd Dep't. 2015) (citation omitted).  The allegations in the SAC fall short.  First and foremost, Plaintiff fails to sufficiently plead that the UK Defendants were enriched.  Rather, the SAC advances the entirely conclusory allegations that "Defendants have been unjustly enriched by Franklin's services" and "Franklin conferred several benefits upon Defendants." SAC, ¶¶ 168, 170.  These allegations, however, do not explain *how* the UK Defendants were enriched by Plaintiff.  Indeed, it is impossible to determine from the face of the SAC (i) in what way the UK Defendants were "enriched" by Plaintiff, (ii) how, exactly, such enrichment came at Plaintiff's expense, or (iii) why it would be "against equity and good conscience to permit" the UK Defendants to retain the fruits of such unspecified and intangible enrichment. *See* Rudd Decl. at ¶ 41 (Plaintiff never assisted the UK Defendants in consummating a business transaction).

Plaintiff's "throw-in" claim for quantum meruit and unjust enrichment does not meet the pleading standard prescribed by Rule 12(b)(6) and accordingly must be dismissed.  *See Mandarin Trading, Ltd. v. Wildenstein*, 16 N.Y.3d 173, 183 (N.Y. 2011) ("Without sufficient

facts, conclusory allegations that fail to establish that a defendant was unjustly enriched at the expense of a plaintiff warrant dismissal."); *Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*, 192 F. Supp. 3d 348, 357 (S.D.N.Y. 2016) (same).  In view of the above, the Sixth Cause of Action should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the UK Defendants respectfully request that the Court dismiss the Second Amended Complaint against them, in its entirety and with prejudice, for lack of personal jurisdiction and failure to state a claim upon which relief can be granted.

Respectfully submitted,

FINN DIXON & HERLING LLP

By:  ____/s/ Tony Miodonka_____
        Alfred U. Pavlis (AP4895)
        Tony Miodonka (TM 5464)
        apavlis@fdh.com
        tmiodonka@fdh.com
        Six Landmark Square
        Stamford, Connecticut 06901-2704
        Tel: (203) 325-5000
        Fax: (203) 325-5001

        *Attorney for Defendants*
        *Compass Partners International, LLP  and*
        *Compass Partners International II, LLP*

**<u>CERTIFICATION</u>**

I hereby certify that on January 5, 2018, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

By: <u>/s/ Tony Miodonka</u>
      Tony Miodonka
      FINN DIXON & HERLING LLP
      Six Landmark Square
      Stamford, Connecticut 06901-2704
      Tel: (203) 325-5000
      Fax: (203) 325-5001
      E-mail: tmiodonka@fdh.com